**Larry Estate**

*Sidney E. Herold*, for accountant.
*Lawrence Solomon*, for Mildred Larry and Vendetta Williams.

BRUNO, *J.*, April 24, 1979—Richard Larry died intestate on June 26, 1967. Letters of administration were granted to Ruby Larry, who claimed to be his surviving spouse, on July 1, 1976.

• • •

Mildred Larry and Vendetta Williams appeared at the audit claiming to be the wife and the only daughter of decedent. They also objected to the accountant's supposed failure to include certain items of personalty and a chose in action in her

account. Since their standing to object to the supposed failure to account for the items depends upon their status as the widow and daughter, the question of their relationship to decedent will be discussed first.

In support of her claim that she is the surviving spouse of decedent, Mildred Larry testified that on April 11, 1953, she and decedent, along with her mother, Janie Cohen, and decedent's mother and brother, went to Delaware to get married. Although she and decedent lived in Philadelphia they went to Delaware because decedent was a fugitive and was afraid to come to city hall for a license and because they were under the impression that they could get married in one day in Delaware. She stated that they went to the city hall in a city in Delaware, the name of which she could not remember, filled out the application for a marriage license, and were informed that they would have to return at a later date for the license. They left Delaware disgruntled without making arrangements for returning to obtain the license, but with the completed marriage license application.

They returned to Philadelphia and, having already made plans for the wedding reception, decided to go ahead and have the reception. About one week after the reception, Mildred, who was eight months pregnant, gave birth to Vendetta, whom she claimed was the result of a liaison with decedent. She stated that about one month after Vendetta's birth, she and decedent, together with her mother and others, went to Reverend Parrish's house on 13th Street in Philadelphia to have a marriage ceremony performed.

When the nuptial party arrived at the minister's

house, he was handed the marriage license application from Delaware and he performed the customary marriage ceremony. After the exchange of vows, decedent was told that he could kiss his new bride.

The ceremony being completed, decedent and his new bride and new child lived together in an apartment in decedent's mother's house. Shortly thereafter, decedent, still a fugitive, was arrested and sent to prison. While he was in prison Mildred and Vendetta visited decedent every two weeks. She produced letters addressed to "Mrs. Mildred Larry" which bore a return address of Holmesburg Prison and which she identified as being in the handwriting of decedent. She also produced a Christmas card which was addressed "Mrs. Mildred Larry," which was also in decedent's handwriting.

Counsel for the accountant objected to the introduction of these letters and the card as being self-serving. However, the witness testified that decedent wrote them to her and, therefore, they are not self-serving. Consequently, in the absence of any other objections, they are admissible.

Mildred Larry's counsel also introduced into evidence, without objection, the marriage license application, the marriage license return, and a letter from the clerk of the peace in Newark, Delaware. Apparently, Reverend Parrish, after performing the ceremony, filled out the return and forwarded it to the proper authorities in Delaware. The letter from the clerk in Newark is addressed to decedent and informs him that the marriage is "illegal" and suggests that he take the steps necessary to correct the situation. Mildred Larry stated that she was

aware of the letter and its contents and that neither she nor decedent did anything to correct the situation.

She further testified that she and decedent never lived together after he was released from prison; that she was aware that decedent later married Ruby Larry; and that she and decedent were never divorced.

Janie Cohen, Mildred's mother, testified that she went with decedent and her daughter to the minister's house, witnessed the ceremony, and heard the exchange of vows.

No witness produced by the accountant contradicted the testimony of Mildred Larry and Janie Cohen.

On the basis of this testimony, Mildred Larry claims that she is the common law wife of decedent. Ruby Larry, the "second wife" and the accountant herein, denies the existence of a valid marriage between Mildred and decedent. She submits that Mildred and decedent intended to have a ceremonial marriage performed using a Delaware marriage license. It was, she claims, never their intention to enter into a common law marriage. Therefore, it is argued, the marriage ceremony performed by a minister using a marriage license application from a foreign jurisdiction did not transform the defective ceremonial marriage into a valid common law marriage.

Unfortunately for the innocent "second wife," the court must recognize the validity of Mildred Larry's claim. Since marriage license acts are directory only and since this Commonwealth recognizes the validity of common law marriages, the only elements necessary for the creation of the marital status are the clearly evidenced intention of the parties to create that status and the clearly evi-

denced expressions of assent to the immediate creation of that status. Both elements are present in the instant case.

The fact that Mildred and decedent had a marriage ceremony performed using a marriage license application from another state is immaterial and of no consequence. In Cordora v. Cordora, 58 D. & C. 87 (1946), it was held that a valid common law marriage can arise when a formal ceremonial marriage is invalid. The facts in that case are strikingly similar to the instant case and bear recitation. In that case, the future husband and wife, after several dates, decided to get married and, one month after the fateful decision, the wife, a resident of Pennsylvania, met the husband in the latter's home in New Jersey. The express purpose for the meeting was to get married. A Mr. Foster, who was present at the meeting, told the couple that he knew a justice of the peace in Berlin, New Jersey, who he thought would perform the ceremony. Upon arrival at the justice's home, they informed the justice of their intentions, but the justice refused to perform the ceremony since they did not have a license.

Undaunted by the refusal, the couple followed a cab driver's suggestion that they see a Mr. Condo, a police recorder. When they arrived at Condo's home, they were told by Condo's sister that he was not there. However, she took them to another New Jersey town where they filled out a marriage license application. Condo's sister then told the couple that Condo was visiting in Philadelphia but would perform the ceremony if they went to Philadelphia. They went to Philadelphia where they convinced Condo to perform a marriage ceremony. After the ceremony, Condo signed a paper which certified that he married the couple in Camden, New Jersey.

The day following the ceremony, the wife, having given the matter some thought, decided that she had made a mistake and demanded that the husband tell Condo that she was not going through with the marriage. It was undisputed that the couple never lived together as husband and wife and that sexual intercourse never took place between them.

The court found that a common law marriage occurred, even though the recorder had no authority to marry the couple and even though the couple had only a license application. It stated at pages 92-93:

"It seems to us that the fact that the New Jersey police recorder had absolutely no authority to perform this ceremony does not prevent the transaction from being a common-law marriage. Certainly the contract was evidence by words in the present tense, uttered with a view to establish the present relation of husband and wife. Even when a properly authorized official performs a ceremony, he does not actually marry the parties, who take each other as husband and wife, but merely sees to it that the ceremony takes place in the customary form."

This court reluctantly finds that a valid common law marriage occurred when Mildred and decedent exchanged vows at the ceremony performed by Reverend Parrish.

This finding is made with the complete awareness that it does substantial harm to Ruby Larry, whom decedent married in a church ceremony in July of 1961. There are times when law and fundamental notions of fairness diverge, and law, the agency through which justice is sought, works an injustice. Mildred Larry never lived with decedent after he was released from jail. She was well aware

of the fact of the defective ceremonial marriage. She was equally aware that decedent married Ruby. She admitted on cross-examination that, after she and decedent separated, she lived with a Mr. Bailey and bore him two children. Her devotion to her common law husband was not of the everlasting type. The only time she chose to press that relationship was after decedent died and she realized the chances were great that she would make a pecuniary recovery.

Nonetheless, there is nothing the auditing judge can do to alter the fact of the common law marriage. Hoc quidem perquam duram est, sed ita lex scripta est.

Concerning Vendetta Williams' claim, Mildred Larry testified that she was eight months pregnant when they went to Delaware to get married; that she had sexual intercourse only with decedent during the year preceding Vendetta's birth; and that Vendetta was Richard's child. She also produced a document captioned "Notification of Birth Registration" which is signed by the then Secretary of Health of the Commonwealth. The document indicates that a birth certificate for Vendetta Larry has been filed with the Bureau of Vital Statistics which lists the mother as Mildred Cohen and the father as Richard Larry. This document was not objected to by counsel for the accountant and is, therefore, admissible.

Vendetta Williams testified that decedent always referred to her as his daughter; that he went to school with her to see the principal when she "got into trouble"; bought her an Easter outfit when he was released from jail; and that he gave her money to help with her wedding expenses.

No one contradicted this testimony.

Accordingly, I find that Vendetta Williams is the

child of decedent Richard Larry. I also find that the subsequent common law marriage of Mildred Cohen and Richard Larry makes her "legitimated for purposes of descent by, from and through" the decedent "as if 'she' had been born during the wedlock of 'her' parents." Section 2107(b) of the Probate, Estates and Fiduciaries Code of June 30, 1972, P.L. 508, 20 Pa.C.S.A. §2107.

• • •

The account shows a balance of principal of $6,722.05 which, composed as indicated, is awarded, subject to the payment of such transfer inheritance tax as may be due and assessed less administratrix' commissions of 5% of the inventory value to Ruby Larry (see appearance slip of counsel), to Mildred Larry and Vendetta Williams, in equal shares.

Payment and distribution is so decreed, with leave to make any and all necessary transfers and assignments.

And now, April 24, 1979, the account is confirmed nisi.